UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

DANIEL SHORT and JOHN VOLNY, *on behalf of themselves and all others similarly situated*

                Plaintiffs,

       v.

CHURCHILL BENEFIT CORPORATION d/b/a
YURCOR and FRAMESTORE, INC.,

                Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**

14-CV-4561 (MKB)

MARGO K. BRODIE, United States District Judge:

On July 30, 2014, Plaintiffs Daniel Short and John Volny, on behalf of a putative class of similarly situated individuals, filed this action against eleven defendants, including Churchill Benefit Corporation d/b/a "Yurcor" ("Yurcor") and Framestore, Inc. ("Framestore"), asserting claims for (1) unlawful deductions from wages in violation of section 193 of the New York Labor Law ("NYLL"), N.Y. Lab. Law. § 193, (2) failure to provide proper wage notices in violation of section 195(1) of the NYLL, N.Y. Lab. Law. § 195(1), and (3) conversion of wages under New York state common law. (Compl. ¶¶ 44–59, Docket Entry No. 1.) Plaintiffs subsequently filed an Amended Complaint, asserting the same claims against only Framestore and Yurcor.[1] (Am. Compl. ¶¶ 44–59, Docket Entry No. 19.) Having completed the first phase of bifurcated individual and class discovery, Plaintiff Short, now the only remaining Plaintiff, as well as Defendants Yurcor and Framestore each move for summary judgment as to Plaintiff's

---

[1] Volny settled his claims and was dismissed from this action on May 1, 2015. (Docket Entry No. 59.)

individual claims.[2]  (Pl. Mot. for Summ. J. ("Pl. Mot."), Docket Entry No. 73; Yurcor Mot. for

Summ. J. ("Yurcor Mot."), Docket Entry No. 82; Framestore Mot. for Summ. J. ("Framestore

Mot."), Docket Entry No. 69.)  For the reasons set forth below, the Court denies the parties'

motions for summary judgment.[3]

## I.  Background

### a.  The parties

Plaintiff is a graphic artist who worked as a "freelancer" in the New York visual effects

("VFX") industry from 2009 through 2014.[4]  (Pl. 56.1 ¶ 2; Fr. Opp'n 56.1 ¶ 2.)  Framestore is an

international VFX company with offices in New York, producing VFX for film, television,

commercials and feature animations.  (Fr. 56.1 ¶¶ 1, 23; POF 56.1 ¶¶ 1, 23.)  Yurcor is a Florida-

---

[2]  On May 14, 2015, the Court held a status conference in advance of the parties moving for summary judgment, and dismissed Plaintiff's claims against Yurcor for violating sections 193 and 195 of the NYLL, based on Plaintiff's failure to plead that Yurcor was his employer and his representation at the conference that Yurcor was not his employer.  (Min. Entry dated May 14, 2015.)  As a result, Plaintiff's only remaining claim against Yurcor was his claim for conversion of wages under New York common law.

[3]  On January 28, 2016, the Court heard oral argument on the parties' motions.  (Min. Entry dated Jan. 28, 2016.)  At that time, at the request of the parties, the Court stayed its decision on the parties' motions pending the completion of Framestore and Plaintiff's scheduled mediation session.  (*Id.*)  Framestore and Plaintiff requested an additional stay pending the outcome of their settlement discussions, (Docket Entry Nos. 101, 103), which the Court granted.  (Order dated Feb. 5, 2016.)  On March 7, 2016, Plaintiff notified the Court that the parties were unable to reach a settlement.  (Docket Entry No. 104.)

[4]  The parties submitted a total of seven statements of material facts pursuant to Rule 56.1 in support of, or opposition to, the motions for summary judgment.  (*See* Pl. Local Rule 56.1 Statement of Material Facts in Supp. of Pl. Mot. ("Pl. 56.1"), Docket Entry No. 73-2; Framestore Counterstatement of Undisputed Material Facts ("Fr. Opp'n 56.1"), Docket Entry No. 74; Yurcor Resp. to Pl. Rule 56.1 Statement of Material Facts (Yur. Opp'n 56.1"), Docket Entry No. 90-2; Framestore Local Rule 56.1 Statement of Undisputed Material Facts ("Framestore 56.1"), Docket Entry No. 70; Pl. Resp. to Fr. 56.1 ("POF 56.1"), Docket Entry No. 75-1; Yurcor Rule 56.1 Statement of Undisputed Material Facts ("Yur. 56.1"), Docket Entry No. 86; Pl. Resp. to Yur. 56.1 ("POY 56.1"), Docket Entry No. 87-1.)

based corporation offering "employer of record" ("EOR") services. (Yur. 56.1 ¶¶ 2, 6; POY 56.1 ¶¶ 2, 6.)

### b. Yurcor's work in the VFX industry

In the VFX industry, Yurcor's EOR services revolve around three parties: (1) Yurcor, (2) clients of Yurcor and (3) freelancers. (Pl. 56.1 ¶ 7; Yur. Opp'n 56.1 ¶ 7.) Yurcor's clients include VFX companies like Framestore, and freelancers include graphic artists like Plaintiff. (Pl. 56.1 ¶¶ 8–10; Yur. Opp'n 56.1 ¶¶ 8–10.) In practice, the VFX company engages freelancers to work on a particular VFX project. (Pl. 56.1 ¶¶ 8–10; Yur. Opp'n 56.1 ¶¶ 8–10.) Through Yurcor's services, the VFX company can "convert" a freelancer into a "W-2 employee" of Yurcor, rather than independent contractor of the VFX company. (Pl. 56.1 ¶¶ 12–13; Yur. Opp'n 56.1 ¶¶ 12–13.) As a W-2 employee of Yurcor, a freelancer performs work for the VFX company, and Yurcor bills the VFX company for the time worked. (Pl. 56.1 ¶¶ 19–20; Yur. Opp'n 56.1 ¶¶ 19–20.) In turn, the freelancers receive their payroll checks and employee benefits from Yurcor. (Pl. 56.1 ¶¶ 19–20; Yur. Opp'n 56.1 ¶¶ 19–20.)

### c. Relationship between Framestore and Yurcor

In 2009, Framestore began searching for a way to "bring down the cost of freelancers," and believed that an EOR service was a "legitimate" way of accomplishing that goal. (Pl. 56.1 ¶ 25; Fr. Opp'n 56.1 ¶ 25; *see also* Email dated July 31, 2009 from J. Collins to K. Barnes at FS 438, annexed to Declaration of Steven Libicki ("Libicki Decl.") as Ex. 6.) As understood by Keith Barnes, Framestore's Financial Controller, by using an EOR service, the EOR could "hire [Framestore's] freelancers as employees of their company and invoice [Framestore] for their time." (Undated email from K. Barnes at FS 440, annexed to Libicki Decl. as Ex. 7.) As to Yurcor's EOR service, Barnes explained that Yurcor would charge Framestore four percent "of

the freelancers' gross pay." (*Id.*)  According to Barnes' example, "if a freelancer's daily rate [was] $200 per diem, [Framestore] pa[id] $208 ($200 + 4%)" to Yurcor for each day worked by the freelancer.  (*Id.*)  Barnes noted that although freelancers normally paid employer taxes as "traditional 1099" independent contractors, using an EOR service, those employer taxes were "withheld from [freelancers'] pay." (*Id.*)

In August of 2009, Framestore and Yurcor negotiated a contract for Yurcor's EOR services.  (Yur. 56.1 ¶ 6; POY 56.1 ¶ 6.)  In an email exchange between Barnes and Alanna Williams, Yurcor's Director of Sales, the parties discussed certain aspects of the Framestore-Yurcor relationship and their prospective agreement.  (Email dated Aug. 4, 2009 from A. Williams, annexed to Libicki Decl. as Ex. 8; Pl. 56.1 ¶ 31; Fr. Opp'n ¶ 31.)  Barnes explained his understanding that under the agreement, while freelancers would be employees of Yurcor and not Framestore, the freelancers would work "under [Framestore's] supervision and direction." (*Id.*)

On August 5, 2015, Framestore and Yurcor executed a Client Agreement (the "Client Agreement").  (Client Agreement 1, annexed to Libicki Decl. as Ex. 4; Pl. 56.1 ¶ 32.)  The Client Agreement stated that Yurcor would provide Framestore with "temporary staffing" to perform "consulting services" such as computer graphics or programming work.  (Client Agreement 1.)  Pursuant to the Client Agreement, Framestore agreed to pay Yurcor a "bill rate," which was the rate at which Framestore would pay Yurcor "for th[e] individual [freelancer]" and Yurcor's services (the "Bill Rate").  (Pl. 56.1 ¶ 54; Yur. Opp'n ¶ 54; Fr. Opp'n ¶ 54; Yur. 56.1 ¶ 14.)  The Bill Rate could vary from freelancer to freelancer.  (Yur. 56.1 ¶ 6; POY 56.1 ¶ 6.)  In addition to the Bill Rate, Yurcor would charge Framestore four percent of the Bill Rate as a fee "for services rendered."  (Yur. 56.1 ¶ 6; POY 56.1 ¶ 6.)  The agreement stated that Framestore "w[ould] not

make any deductions from the fees paid to Yurcor . . . for any federal, state or local taxes," as it was "Yurcor's obligation to make all income tax and other tax withholdings and payments." (Client Agreement 1.) As stated in Schedule A of the Client Agreement, "[t]he employer as well as the employee side of the taxes [would] be deducted from the Freelancer[s'] account at time of payroll." [5] (Schedule A annexed to Client Agreement; Pl. 56.1 ¶ 32; Fr. Opp'n 56.1 ¶ 32; Yur. Opp'n 56.1 ¶ 32.)

### d. Framestore's use of Yurcor's EOR services generally

After executing the Client Agreement, Framestore began using Yurcor's EOR services in its freelancer retention process. In practice, Framestore contacted freelancers with dates and details for a project and solicited the freelancer's interest and availability. (Fr. 56.1 ¶ 12; POF 56.1 ¶ 12.) When a freelancer was interested in the work offered, the freelancer confirmed his or her availability via email, which, according to Framestore, constituted the "booking" of the freelancer. (Fr. 56.1 ¶ 12; POF 56.1 ¶ 12.) Thereafter, Framestore presented prospective freelancers with two options: (1) freelancers who maintained their own corporate structures — running their own payroll, paying their taxes and Workers' Compensation Insurance and meeting other criteria — were eligible to work as independent contractors of Framestore; and (2) freelancers who did not qualify under the first option would be referred to, and engaged through, Yurcor as the EOR. (Fr. 56.1 ¶ 8; POF 56.1 ¶ 8.) Under the second option, the freelancer would establish an employment relationship with Yurcor "for payroll and benefits purposes." (Fr. 56.1 ¶ 13; POF 56.1 ¶ 13.)

---

[5] It is undisputed that this contractual relationship remained in effect from 2009 through 2013. (Yur. 56.1 ¶¶ 6–8; POY 56.1 ¶¶ 6–8.) A second Client Agreement was executed in March of 2013, which preserved the prior Client Agreement's terms but increased the premium Framestore paid to Yurcor from four percent of the Bill Rate to nineteen percent of the Bill Rate. (Yur. 56.1 ¶¶ 6–8; POY 56.1 ¶¶ 6–8.)

After the referral, the freelancer's Bill Rate was then agreed upon. (Fr. 56.1 ¶ 14; POF 56.1 ¶ 14; Yur. 56.1 ¶ 9; POY 56.1 ¶ 9.) The parties dispute whether the freelancer was a party to the agreement setting the Bill Rate. According to Framestore, the Bill Rate was "the amount communicated to the freelancer" at the time of the freelancer's booking and was agreed upon between Framestore, Yurcor and the freelancer. (Fr. 56.1 ¶ 14.) According to Yurcor, the Bill Rate was agreed upon between Yurcor and Framestore only. (Fed. R. Civ. Proc. 30(b)(6) deposition of Alanna Williams on behalf of Yurcor ("Yurcor Dep.") 101:6–18, annexed to Libicki Decl. as Ex. 34.)

Once the Bill Rate was determined, Yurcor and the freelancer would agree to a "Pay-Rate." (Yur. 56.1 ¶ 11; POY ¶ 11; Fr. 56.1 ¶ 15; POF 56.1 ¶ 15.) The Pay Rate was what Yurcor paid to the freelancer, and was equal to the Bill Rate less the amount Yurcor labeled "Administrative Overhead Costs." (Yurcor Dep. 101:25–102:6; Yur. 56.1 ¶¶ 11, 18; POY 56.1 ¶¶ 11, 18; Fr. 56.1 ¶ 15; POF 56.1 ¶ 15.) It is undisputed that the Administrative Overhead Costs were the "employer taxes" that Yurcor was "responsible for," specifically "FICA, FUTA, SUI, [and] workers comp[ensation]" taxes. (Yurcor Dep. 102:15–22; Pl. 56.1 ¶ 57; Yur. Opp'n 56.1 ¶ 57.)

### e. Plaintiff's relationship with Framestore and Yurcor

In early 2012, Framestore contacted Plaintiff about working on Framestore projects as a VFX compositor.[6] (Pl. 56.1 ¶ 41; Fr. Opp'n 56.1 ¶ 41; Fr. 56.1 ¶ 21; POF 56.1. ¶ 21.) In April

---

[6] A VFX compositor works with digital images and enhances them so that they look real and "indiscernible from reality." (Fr. 56.1 ¶ 1; POF 56.1 ¶ 1.) The compositor attempts to seamlessly combine elements from multiple sources into a final image that appears to have come from a single source. (Pl. 56.1 ¶¶ 67–68.) The majority of this work is computer-based, as the compositor combines each layer or elements of a particular "shot," which may include live-action and computer graphic elements. (*Id.*)

2012, Evan Reinhard, a Human Resources Specialist for Framestore, and Alex Lemke, the VFX supervisor of Framestore's film department, interviewed Plaintiff at Framestore's Manhattan offices. (Pl. 56.1 ¶ 42; Fr. Opp'n 56.1 ¶ 42.) Although Plaintiff was not hired into the film department at that time, Reinhard, who had authority to hire freelancers, asked Plaintiff to consider working in Framestore's commercial department. (Pl. 56.1 ¶¶ 42–43; Fr. Opp'n 56.1 ¶¶ 42–43.)

On June 6, 2012, Reinhard "booked" Plaintiff to work on a project from June 8, 2012 through July 3, 2012. (Pl. 56.1 ¶ 43; Fr. Opp'n 56.1 ¶ 43.) Reinhard sent Plaintiff an email (the "June 6, 2012 Booking Email"), stating "[w]e would like to confirm your booking with us for the date[s] below," listing dates of June 18, 2012 through July 3, 2012. (Email dated June 6, 2012 ("June 6, 2012 Booking Email") at P 3172, annexed to the Declaration of Daniel Short ("Pl. Decl.") as Ex. 3.) Reinhard stated that the booking was "at a rate of" $600 per weekday, $650 per weekend day and $75 an hour after Plaintiff worked ten hours in a day (the "$600 Weekday Base Rate"). (Id.) The email stated that Plaintiff should contact Framestore's accountant, Barnes, "to set up method of payment." (Id.) Plaintiff responded via email stating, "Confirmed." (Id.)

That same day, Barnes emailed Plaintiff the two payment options available for Framestore freelancers. (Email dated June 6, 2012 from K. Barnes ("Method of Payment Email") at P 323, annexed to Pl. Decl. as Ex. 2.) Barnes explained that a freelancer could (1) work "through a company" if Plaintiff qualified[7] or (2) work "through an [EOR]." (Id.; see also Pl. 56.1 ¶ 44; Fr. Opp'n 56.1 ¶ 44.) As to the second option, Barnes provided Plaintiff with

---

[7] Barnes explained that to work "through a company" Plaintiff needed proof that Plaintiff had a company and that the company "[ran] a payroll," had completed a "W-9 form," and had proof of worker's compensation insurance. (Method of Payment Email at P 323.)

a link to Yurcor's website, explaining that he should visit the site before beginning his booking and gather the necessary paperwork. (Method of Payment Email at P 323; Pl. 56.1 ¶ 44; Fr. Opp'n 56.1 ¶ 44.) Because Plaintiff did not meet the requirements to work for Framestore "through a company," Plaintiff was referred to Yurcor for payment through an EOR.[8] (Pl. 56.1 ¶ 44; Fr. Opp'n 56.1 ¶ 44.)

### f. Plaintiff completes Yurcor's pre-employment process

On June 19, 2012, Plaintiff emailed Yurcor, informing them that he was "a new hire at Framestore NY," and asking how he should provide the relevant forms found on the Yurcor website. (Pl. Decl. ¶ 20; Email dated June 19, 2012 from D. Short ("Pl. June 19, 2012 Email"), annexed to Pl. Decl. as Ex. 5.) In addition to noting that he was "declin[ing] from the Yurcor 401K and health plans," Plaintiff explained:

> I have a day rate that was agreed upon by Even Reinhard (Producer) at Framestore, that your wage form didn't seem to allow space for, so I would like to clarify it here. He agreed to a pay rate of $600/weekday (day = 10 hours), and an hourly rate of $75 for each additional hour worked past 10. The rate would change to $650/weekend day (day = 10 hours), and an hourly rate of $75 for each additional hour worked past 10. I am happy to forward that email and confirmation along to you if you request it.

(Pl. June 19, 2012 Email.)

Plaintiff completed a Yurcor "General Agreement Letter," dated June 17, 2012, which appears to reflect some of the terms referenced in Plaintiff's June 19, 2012 email.[9] (Pl. Decl.

---

[8] According to Framestore, Plaintiff "chose to work through Yurcor." (Fr. 56.1 ¶ 23.) However, according to Plaintiff, Framestore directed him to Yurcor because he could not meet the requirements to work as an independent contractor for Framestore — specifically, that he did not maintain his own corporate structure. (POF 56.1 ¶ 23.)

[9] Plaintiff testified that his understanding was that he could not be paid unless he completed forms including the General Agreement Letter. (Pl. Dep. 129:5–10.)

¶ 19; Gen. Agreement Letter ("GAL") at P 3, annexed to Pl. Decl. as Ex. 10; Dep. of Daniel

Short ("Pl. Dep.") 128:25–129:10, annexed to Decl. of Jonathan Stoler ("Stoler Decl.") as Ex. M,

Docket Entry No. 76.)  The General Agreement Letter begins by stating that Yurcor is "pleased

to confirm our offer to you of employment," and lists a "mutually agreed upon starting date" of

June 18, 2012.  (GAL at P 3.)  The letter and handwritten annotations address payment terms,

stating:

> As a Yurcor employee, you will be paid on a consistent agreed
> basis at an initial base rate of $600/first 10 hours[,] $75/hour after
> 10 [hours] per day[,] $650/day on weekends + $75/hour after 10
> [hours] per day . . . . for each work day you perform for Yurcor in
> a workweek (based on your timesheets) on projects assigned by
> Yurcor.[10]

(*Id.*)  Handwritten annotations on the letter add wage-related terms, stating that Plaintiff would

be paid $75 per hour after working ten hours, $650 per day on weekends and $75 per hour "after

[ten] per day.[11]  (*Id.*)

Yurcor's Client Services Manager, Michelle Murphy, responded to Plaintiff's June 19,

2012 email in a separate email, welcoming him to Yurcor and providing a "Step-by-Step Guide"

to Yurcor's EOR Service (the "Step-by-Step Guide").  (Email dated June 19, 2012 from M.

Murphy to D. Short ("Step-by-Step Guide Email") at P 472, annexed to Pl. Decl. as Ex. 6.)  The

Step-by-Step Guide described the Bill Rate and the Pay Rate and the distinction between the two,

stating that, after the "studio client" identified a freelancer, "Yurcor, [the] studio client and [the]

freelancer establish[ed] Yurcor's bill rate to [the] client" and that the "[f]reelancers pay rate is

the Yurcor bill rate less the administration overhead cost."  (*Id.*)  The Step-by-Step Guide also

---

[10]  The phrase "$600\first 10 hours" is handwritten into the letter.  (GAL at P 3.)

[11]  According to Plaintiff, he understood that the purpose of the General Agreement was
to establish the rate of pay for his work at Framestore rather than an offer of employment by
Yurcor.  (Pl. Decl. ¶ 19.)

stated, "the agreed upon Yurcor bill rate to Framestore is NOT your pay rate." (*Id.*) Regarding taxes, it stated, "[a]s an employee of Yurcor you will not have to deal with the 15.3% Self Employment Tax . . . at year end since employer taxes are paid on your behalf through administrative overhead charges and employee taxes are withheld and remitted through your payroll." (*Id.*) Shortly after receiving the Step-by-Step Guide from Murphy, Plaintiff responded, "I appreciate the step by step breakdown. I also understand that my 'rate' will have taxes and possibly a Yurcor fee deducted from it."[12] (*Id.* at P 473; Pl. Decl. ¶ 21.)

On June 19, 2012, Yurcor also sent Plaintiff a New York State Labor Law § 195 "Notice and Acknowledgement of Wage Rate(s) for Temporary Help Firms" form (the "NYLL Wage Notice"). (Fr. 56.1 ¶ 32; NYLL Wage Notice, annexed to Stoler Decl. as Ex. H.) The NYLL Wage Notice is dated June 19, 2012, and lists Plaintiff's "rate(s) of pay" as (1) $503.19 "per day on the first $8500 gross payroll," (2) $552.79 "per day after $8500 in gross payroll and (3) $75 per hour for overtime." (NYLL Wage Notice.) Plaintiff's name is printed on the NYLL Wage Notice, but the notice is unsigned. (*Id.*) According to Yurcor, Plaintiff electronically signed the Wage Notice.[13] (Yur. 56.1 ¶ 27; Decl. of Alanna Williams ("Williams Decl.") ¶ 8, Docket Entry

---

[12] According to Plaintiff, despite communicating this understanding, he found parts of Murphy's email "confusing" — specifically, the description of how employer taxes were paid and the reference to a "Yurcor W-2 employee." (Pl. Decl. ¶ 22.) Framestore asserts that Plaintiff's purported confusion about the email is contrary to his deposition testimony. (Fr. Opp'n 56.1 ¶¶ 39, 61; Fr. 56.1 ¶ 30.) This factual dispute is not material to the Court's resolution of the parties' motions.

[13] Yurcor contends that two facts demonstrate that Plaintiff signed the Wage Notice, (1) an electronic "signature receipt" from Yurcor's software reflects the time and date Short "saw and signed the Wage Notice," and (2) Yurcor completed Plaintiff's payroll and enrollment, which would not have occurred without Plaintiff's signature on the Wage Notice. (Yur. 56.1 ¶ 27; Williams Decl. ¶ 8; Ex. B annexed to Williams Decl.) Plaintiff disputes this evidence, but concedes that, at his deposition, he testified that while he did not recall receiving the Wage Notice he may have electronically signed it. (Pl. Dep. 130:13–18.)

No. 85; Screenshot annexed to Williams Decl as Ex. B.)

That same day, Murphy informed Framestore that she had received Plaintiff's forms and asked Framestore to "confirm" Plaintiff's rates. (Email dated June 19, 2012 from M. Murphy ("Murphy June 19, 2012 Email"), annexed to Libicki Decl. as Ex. 12.) In response, Barnes informed Murphy that Plaintiff was "a day rate freelancer, and we've agreed to his rates of $600 [per day] weekday, $650 [per day] weekend, & $75 [per hour] after 10 hours worked in a day," which were all "exclusive of Yurcor's 4%." (Murphy June 19, 2012 Email; Pl. 56.1 ¶ 47; Fr. Opp'n 56.1 ¶ 47; Yur. Opp'n 56.1 ¶ 47.)

### g. Plaintiff's work at Framestore and payments by Yurcor

Plaintiff began to work at Framestore on June 18, 2012, and was engaged, or "booked," to work on Framestore projects thirteen times through May of 2013. (Pl. 56.1 ¶ 93; Fr. Opp'n 56.1 ¶ 93; Yur. Opp'n 56.1 ¶ 93; Yur. 56.1 ¶ 30; POY 56.1 ¶ 30.) Throughout, Plaintiff worked at Framestore's New York offices and used their equipment. (Pl. 56.1 ¶ 81; Fr. Opp'n 56.1 ¶ 81.) Because of the hours Plaintiff was required to work, Plaintiff could not work for another company. (Pl. 56.1 ¶ 83; Fr. Opp'n 56.1 ¶ 83; Yur. Opp'n 56.1 ¶ 83.) At no point did Plaintiff meet face to face with an employee of Yurcor, and Yurcor had no control over how Plaintiff performed his work for Framestore. (Pl. 56.1 ¶¶ 84, 94; Fr. Opp'n 56.1 ¶¶ 84, 94; Yur. Opp'n 56.1 ¶¶ 84, 94.)

Plaintiff was paid by Yurcor for each booking. "Payroll Report Detail" forms ("PRDs") generated by Yurcor for the time period Plaintiff worked on Framestore projects in 2012 reveal Plaintiff's compensation for each booking. (Pl. 56.1 ¶ 95; Yur. Opp'n 56.1 ¶ 95; Yur. 56.1 ¶ 29;

POY 56.1 ¶ 29; PRD at P 20–P 33,[14] annexed to Libicki Decl. as Ex. 14.) For example, the PRD for the week of June 18, 2012 through June 22, 2012 lists five days of work[15] and a total of $3,000 for "Yurcor Total Labor Collected."[16] (PRD at P 20.) Line items in the next section of the PRD show that the $3,000 was reduced by Yurcor Administrative Overhead costs of $479.84, which consisted of the employer-portion of FICA and FUTA taxes, unemployment insurance and a deduction for worker's compensation.[17] (*Id.*) The remaining balance of $2,520.16 was listed as Plaintiff's gross pay, which, according to Yurcor and Framestore, constituted Plaintiff's Pay Rate.[18] (Yur. 56.1 ¶ 29; Fr. 56.1 ¶ 42; PRD at P 21.) Yurcor paid Plaintiff this Pay Rate as his wage.

It is undisputed that Plaintiff reviewed the PRD for his first booking and continued accepting bookings with Framestore. (Fr. 56.1 ¶ 43; POF 56.1 ¶ 43.) The remaining PRDs for 2012 followed the same format — employer taxes and worker's compensation were subtracted from the Total Labor Collected by Yurcor from Framestore to calculate Plaintiff's gross pay, and

---

[14] Plaintiff submits the PRD for multiple months as a single exhibit. For ease of reference, the Court refers to the specific number bates stamped on each PRD.

[15] The PRD lists this as the "qty" being invoiced to Framestore. (Pl. 56.1 ¶ 97; Fr. Opp'n 56.1 ¶ 97.)

[16] This number reflects a $600 per day rate for five days of work, which, according to Yurcor and Framestore, referred to the Bill Rate Framestore paid to Yurcor for Plaintiff's time. (Yur. 56.1 ¶ 29; Fr. 56.1 ¶ 42.)

[17] The PRD itemizes the Yurcor Administrative Overhead Costs as $192.79 for "Employer FICA," $15.12 for "Employer FUTA," $249.50 for "Employer SUI," and $22.43 for "Worker's Compensation Deduction." (PRD at P 20.)

[18] Yurcor subtracted a total of $937.81 for employee payroll taxes from Plaintiff's gross pay of $2,520.16,. The PRD's itemization of these taxes reflect subtractions of $547.84 for "Employee Federal Income Tax," $142.39 for "Employee FICA," $90.44 for "Employee Local Income Tax," $156.54 for "Employee State Income Tax" and $0.60 for "Employee SUI." (PRD at P 20.)

Plaintiff's employee payroll taxes were subtracted from the gross pay to reach the Pay Rate.[19] (PRD at P 21–P 33.)  At no point did Plaintiff complain or question Framestore or Yurcor regarding the calculation of his Pay Rate.  (Fr. 56.1 ¶ 44; POF 56.1 ¶ 44.)  Yurcor issued W-2 forms to Plaintiff for his work in both 2012 and 2013.  (Pl. 56.1 ¶ 101; Yur. Opp'n 56.1 ¶ 101.)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013).  The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id*.  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational

---

[19]  The exceptions were the PRD for August 27–September 7, 2012 (PRD at P 25), and the PRD for December 10–16, 2012 (PRD at P 33.)  These PRDs list an additional subtraction of "Billable Expenses."  (PRD at P 25, P 33.)  According to Plaintiff, although he continued working on Framestore projects until May 2013, he could not access any PRD for periods beyond December of 2012.  (Pl. 56.1 ¶ 99.)  In October 2013, Framestore stopped using Yurcor's EOR services.  (Pl. 56.1 ¶ 102; Fr. Opp'n 56.1 ¶ 102.)  As a result, if Framestore hired Plaintiff today, he would be hired as an employee of Framestore and Framestore would pay the employer's share of payroll taxes.  (Pl. 56.1 ¶ 105; Fr. Opp'n 56.1 ¶ 105.)

juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b. Section 193 unlawful deduction claim against Framestore

Plaintiff moves for summary judgment as to his section 193 unlawful deduction claim against Framestore.[20] Plaintiff contends that as an employee of Framestore, consistent with his agreement with Framestore, Plaintiff was to be paid wages at the $600 Weekday Base Rate. (Pl. Mem. 1–2, 20–21; Pl. 56.1 ¶ 43.) According to Plaintiff, Yurcor, acting as Framestore's payroll company, improperly deducted Framestore's employer payroll taxes and workers' compensation premiums from the $600 Weekday Base Rate Framestore agreed to pay Plaintiff as his wage, despite having agreed to the $600 Weekday Base Rate as his wage. (Pl. Mem. 20–21.)

Framestore opposes Plaintiff's motion and cross-moves for summary judgment, contending that Plaintiff and Framestore did not agree to a wage equal to the $600 Weekday Base Rate, because the $600 Weekday Base Rate was merely the Bill Rate to be paid by Framestore to Yurcor under the Client Agreement. (Framestore Mem. in Opp'n to Pl. Mot. ("Framestore Opp'n") 10–14; Framestore Mem. 7–11; Fr. 56.1 ¶ 24.) According to Framestore, Plaintiff's wage was instead the Pay Rate to which he agreed with Yurcor. (Framestore Opp'n

---

[20] (Pl. Mot.; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 73-1; Framestore Mot.; Framestore Mem. in Support of Framestore Mot. ("Framestore Mem."), Docket Entry No. 72; Yurcor Mot.; Yurcor Mem. in Support of Yurcor Mot. ("Yurcor Mem."), Docket Entry No. 83.)

10–14; Framestore Mem. 7–11; Fr. 56.1 ¶ 24.) According to Framestore, because any deductions were made from the Bill Rate and not Plaintiff's Pay Rate, they were not deductions from Plaintiff's wage. (Framestore Mem. 7–11; Framestore Opp'n 10–11.) Framestore contends that because no improper deductions were made from Plaintiff's Pay Rate, Plaintiff's section 193 claim fails as a matter of law. (Framestore Opp'n 14.)

Plaintiff responds that any distinction between the Bill Rate and the Pay Rate arises from a contract that is void and unenforceable because its purpose was to place the burden of paying employer payroll taxes on the employee and provide "kickbacks" to Yurcor. (Pl. Reply to Framestore in Supp. Pl. Mot. ("Pl.-Fr. Reply") 8, Docket Entry No. 80; Pl. Mem. in Opp'n to Fr. Mot. ("Pl. Opp'n Fr.") 4, 8, Docket Entry No. 75.).

"The history of Labor Law § 193 manifests the legislative intent to assure that the unequal bargaining power between an employer and an employee does not result in coercive economic arrangements by which the employer can divert a worker's wages for the employer's benefit." *Angello v. Labor Ready, Inc.*, 7 N.Y.3d 579, 586 (2006). To carry out the statute's purpose, section 193 severely limits what employers may deduct from employee wages. N.Y. Lab. Law § 193(a); *see also Hudacs v. Frito-Lay, Inc.*, 90 N.Y.2d 342, 346–47 (1997) (discussing the legislative history and purpose of section 193). Pursuant to the statute, employers may only make those deductions required by law or regulation, such as those for federal taxes, *see Hochstein v. United States*, 900 F.2d 543, 549 (2d Cir. 1990) ("The withholding of federal taxes is expressly authorized by New York's Labor Law." (citing N.Y. Lab. L. § 193(1)(a))), or those deductions authorized by the employee for the employee's benefit, *Marsh v. Prudential Sec. Inc.*, 1 N.Y.3d 146, 152 (2003) (citing N.Y. Lab. Law § 193(1)(b)). Even with the employee's consent, deductions are limited to "specific categories of wage withholdings" based

on that consent, such as payments for "insurance premiums," "pension or health and welfare benefits," or "United States bonds." *See Marsh*, 1 N.Y.3d at 152 (quoting N.Y. Lab. Law § 193(1)(b)).

Accordingly, the scope of permissible deductions is narrow, and liability will attach where (1) there is an employer-employee relationship; (2) the employer makes a deduction from the employee's *wages*; and (3) the deduction is not otherwise permitted by law or authorized for the employee's benefit. *See Hudacs*, 90 N.Y.2d at 346–47 ("Labor Law § 193 prohibits employers from making any deductions from wages, except as required by law or regulation, or authorized by the employee for the employee's benefit."); *Hart v. Rick's Cabaret Int'l Inc.*, 967 F. Supp. 2d 901, 936 (S.D.N.Y. 2013) (noting that there was a "substantial question" about "whether the deductions made by [the defendant] were 'from wages,' as required for there to be liability under [section 193]"); *Xuedan Wang v. Hearst Corp.*, No. 12-CV-793, 2013 WL 105784, at *2 (S.D.N.Y. Jan. 9, 2013) ("Section 193(3)(a) does not prohibit 'any payment by separate transaction' in itself but such a payment 'as a deduction from wages.'").

The Court addresses each of the elements of Plaintiff's section 193 claim.

### i. The existence of an employer-employee relationship

In seeking summary judgment, Framestore and Plaintiff agree that Plaintiff was an employee and not an independent contractor, (Pl. 56.1 ¶¶ 48, 50; Fr. Opp'n 56.1 ¶¶ 48, 50; Jan. 28, 2016 Hr'g Tr. 3:9–25),[21] although they disagree as to whether Plaintiff was employed by

---

[21] Neither party disputes that Plaintiff was an employee or that Framestore was his employer. "In order to state a claim under article 6, a plaintiff must first demonstrate that he or she is an employee entitled to its protections." *Hernandez v. Chefs Diet Delivery, LLC*, 915 N.Y.S.2d 623, 624 (App. Div. 2011) (citing *Bhanti v. Brookhaven Mem'l Hosp. Med. Ctr., Inc.*, 687 N.Y.S.2d 667, 669 (App. Div. 1999))). The NYLL defines "employee" as "any person employed for hire by an employer in any employment," and excludes individuals working as independent contractors from this definition. N.Y. Lab. Law § 190(2); *see also Buyer's First*

Framestore solely, or jointly with Yurcor. Plaintiff has argued throughout this litigation that Framestore was his sole employer. (Am. Compl. ¶ 39.) In moving for summary judgment and opposing Plaintiff's motion, Framestore agrees that it was Plaintiff's employer and concedes that it "was a joint employer" of Plaintiff along with Yurcor.[22] (Framestore Mem. 5 n.1; Framestore Opp'n 1; Jan. 28, 2016 Hr'g Tr. 3:9–25.) Accordingly, for purposes of assessing Framestore's liability under section 193, neither party contests Plaintiff's status as an employee of Framestore.

### ii. Plaintiff's wage

Because section 193 prohibits deductions from an employee's *wage*, the Court must assess whether Plaintiff's wage is the $600 Weekday Base Rate, as Plaintiff claims, or the lesser Pay Rate, as Framestore claims.

"A 'plaintiff cannot assert a statutory claim for wages under [section 193 of] the Labor Law if he has no enforceable contractual right to those wages.'" *O'Grady v. BlueCrest Capital Mgmt. LLP*, No. 15-CV-1108, 2015 WL 3740701, at *9 (S.D.N.Y. June 15, 2015) (alteration in original) (quoting *Tierney v. Capricorn Investors, L.P.*, 592 N.Y.S.2d 700, 703 (App. Div. 1993)); *Jankousky v. N. Fork Bancorporation, Inc.*, No. 08-CV-1858, 2011 WL 1118602, at *4

---

*Choice, Inc. v. Simme*, 10 N.Y.S.3d 788, 788 (App. Div. 2015) ("[W]e agree with plaintiff that the [NYLL's] definition of 'employee' excludes independent contractors . . . ." (first citing *Hernandez*, 915 N.Y.S. at 624; and then citing *Akgul v. Primetime Transp., Inc.*, 741 N.Y.S.2d 553, 446 (App. Div. 2002))); *Hernandez*, 915 N.Y.S.2d at 624 (same); *Chenensky v. New York Life Ins. Co.*, No. 07-CV-11504, 2011 WL 1795305, at *4 (S.D.N.Y. Apr. 27, 2011) ("Independent contractors are immune from the protections of [section] 193." (first citing N.Y. Labor Law § 193; then citing *Akgul*, 741 N.Y.S.2d at 556)). At oral argument on the parties' motions, Framestore stated that, in light of the evidence, it could not dispute that Plaintiff was an independent contractor, but it did not concede that all other putative class members were employees rather than independent contractors, and reserved its right to make that argument as to class members other than Plaintiff. (Jan. 28, 2016 Hr'g Tr. 3:9–25.)

[22] As discussed *infra* section II.b.i, the Court finds that, as a matter of law, Yurcor qualified as Plaintiff's joint-employer.

(S.D.N.Y. Mar. 23, 2011) ("Until the wages are agreed upon, there can be no deduction within the meaning of the NYLL."). Thus, "when claims are brought under Section 193(3)(a), the frequently disputed issue is whether the [deduction] is 'from wages.'" *Xuedan Wang*, 2013 WL 105784, at *2 (citations omitted).

The NYLL defines "wages" as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." N.Y. Lab. Law § 190. An employee's wage may be set by agreement between the employer and employee. *See Arbeeny v. Kennedy Exec. Search, Inc.*, 893 N.Y.S.2d 39, 41 (App. Div. 2010) (interpreting and enforcing the compensation terms of the parties' agreement); *Kletter v. Fleming*, 820 N.Y.S.2d 348, 350 (App. Div. 2006) ("The parties' contract unambiguously specifies that defendant shall be paid '33% of all net fees collected' for his services . . . .").

Here, the parties dispute the amount that constituted Plaintiff's wage. Plaintiff asserts that Framestore agreed to pay wages at the $600 Weekday Base Rate. (Pl. Mem. 1–2.) However, according to Framestore, the $600 Weekday Base Rate referenced by Plaintiff was only the Bill Rate to be paid by Framestore to Yurcor, to which Plaintiff was not entitled. (Framestore Mem 11–12; Framestore Opp'n 10–14.) Framestore asserts that Plaintiff's wage was instead the Pay Rate, which, as Plaintiff knew, was the Bill Rate minus Yurcor's Administrative Overhead. (Framestore Mem 7–12.) Put simply, Plaintiff's section 193 claim rises or falls on the question of what constituted Plaintiff's wage — if the $600 Weekday Base Rate was Plaintiff's wage, the claim succeeds; if the $600 Weekday Base Rate was only a Bill Rate, and Plaintiff's wage was the Pay Rate, Plaintiff's claim fails.

### 1. The relevant agreement as to Plaintiff's wage

Although the parties spend considerable time arguing about their competing views of the

wage Plaintiff agreed to be paid, neither party explicitly addresses whether there was an agreement — express or implied — establishing Plaintiff's wage under the NYLL.  In taking diametrically opposed positions as to Plaintiff's wage, the parties rely on different writings as evidence of the applicable wage, implicitly asserting that these writings formed the relevant agreement as to Plaintiff's wage.  (Pl. Mem. 8–9; Framestore Mem. 7–9.)  Plaintiff relies on the June 6, 2012 Booking Email from Reinhard to Plaintiff, to argue that the parties "agree[ed]" that Framestore would pay Plaintiff the $600 Weekday Base Rate as his wage.  (Pl. Mem. 8–9.) Framestore relies on Yurcor's Step-by-Step Guide and the Yurcor NYLL Wage Notice to argue that the Pay Rate was Plaintiff's wage and that the $600 Weekday Base Rate was only the Bill Rate.  (Framestore Mem. 9–12.)  The Court first determines whether the proffered writings constituted an agreement.

As noted above, an employee's wage may be set by an agreement between the employer and employee.  *See Arbeeny*, 893 N.Y.S.2d at 41 (interpreting and enforcing the compensation terms of the parties' agreement); *Kletter*, 820 N.Y.S.2d at 350.  "Under New York law, whether a binding agreement exists is a legal issue, not a factual one."  *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008) (citations omitted).  Importantly, "an exchange of emails may constitute a binding contract under New York law," where the parties do not "contemplate further negotiations and the execution of a formal instrument."  *Rubinstein v. Clark & Green, Inc.*, 395 F. App'x 786, 788 (2d Cir. 2010) (first citing *Stevens v. Publicis, S.A.*, 854 N.Y.S.2d 690, 692 (1st Dep't 2008); and then citing *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998)).

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d

393, 427 (2d Cir. 2004) (citations omitted).  This "meeting of the minds must include agreement on all essential terms."  *Kolchins v. Evolution Markets, Inc.*, 8 N.Y.S.3d 1, 9 (App. Div. 2015) (citations omitted).  "[W]hether a binding contract exists can be answered only by looking to 'the objective manifestations of the intent of the parties,'" *Turner v. Temptu Inc.*, 586 F. App'x 718, 721 (2d Cir. 2014) (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y. 2d 397, 393 (1977) ("*Brown Bros.*")), which is "gathered by their expressed words and deeds," *Zheng v. City of New York*, 19 N.Y.3d 556, 577 (2012) (quoting *Brown Bros.*, 41 N.Y.2d at 393). Courts determine the objective manifestations of the parties' intent by first examining "the communications between the parties."  *Kolchins*, 8 N.Y.S.3d at 9.

An offer must be "sufficiently definite . . . such that its unequivocal acceptance will give rise to an enforceable contract."  *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999) (citing *Martin Delicatessen, Inc.*, 52 N.Y.2d 105, 109 (1981)). "Definiteness as to material matters is of the very essence of contract law [and] [i]mpenetrable vagueness and uncertainty will not do."  *Id.* at 589 (citing *Martin Delicatessen*, 93 N.Y.2d at 589).  In addition, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Carione v. Hickey*, 20 N.Y.S.3d 157, 158 (App. Div. 2015) (quoting *Express Indus.*, 93 N.Y.2d at 589).  This manifestation of assent "may be by word, act, or conduct which *evinces the intention of the parties to contract.*"  *Register.com*, 356 F.3d at 427 (quoting *Maffea v. Ippolito*, 668 N.Y.S.2d 653, 654 (App. Div. 1998)).  In general, "for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal." *Kolchins*, 8 N.Y.S.3d at 9 (quoting *King v. King*, 617 N.Y.S.2d 593, 593 (App. Div. 1994)).

### A. The Booking Email and Plaintiff's response gave rise to an agreement

Here, a reasonable jury could find that the June 6, 2012 Booking Email and Plaintiff's response gave rise to an enforceable agreement as to the dates Plaintiff would work for Framestore and the "rate" Framestore would pay for Plaintiff's work. In the June 6, 2012 Booking Email, Reinhard listed the material terms of the agreement — the particular Framestore project, the relevant dates for Plaintiff's work on that project and the "rate" Framestore would pay for Plaintiff's work. (June 6, 2012 Booking Email at P 3172.) Although concise, these terms were sufficiently definite to constitute an offer. *See Express Indus.*, 93 N.Y.2d at 589. Plaintiff's email response stating, "CONFIRMED," was a "clear, unambiguous and unequivocal" acceptance of the terms of that offer. *See Kolchins*, 8 N.Y.S.3d at 9; (June 6, 2012 Booking Email at P 3172.) Accordingly, the Booking Email and Plaintiff's response constituted a valid offer and acceptance. The Court reaches the same conclusion as to Plaintiff's approximately six subsequent bookings at Framestore. Each time, Framestore and Plaintiff repeated the process, with each instance qualifying as a valid offer and acceptance, as Framestore sent Plaintiff identical emails — listing the project, dates and the $600 Weekday Base Rate — and Plaintiff replied, confirming the booking. (Emails annexed to Pl. Decl. as Ex. 12.)

### B. The writings proffered by Framestore are not agreements

Defendants ignore the significance of the booking emails, including the June 6, 2012 Booking Email, and instead assert that certain email communications between Plaintiff and Yurcor established the Pay Rate as Plaintiff's wage. (Framestore Mem. 7–9.) Defendants specifically rely on Plaintiff's receipt and acknowledgement of Yurcor's Step-by-Step Guide and the NYLL Wage Notice as the relevant writings, which they argue establish Plaintiff's wage as the Pay Rate. (*Id.*) However, as discussed below, these writings do not reflect an unambiguous

offer upon which the parties could mutually assent.

Neither the Step-by-Step Guide nor the NYLL Wage Notice are offers of employment at a particular wage.  As to the Step-by-Step Guide, it is undisputed that it detailed how Yurcor would calculate Plaintiff's Pay Rate, and explicitly stated that the Bill Rate paid by Framestore was not Plaintiff's Pay Rate.  (Step-by-Step Guide Email at P 472.)  It is also undisputed that Plaintiff communicated his understanding that the Pay Rate described in the Step-by-Step Guide would have "taxes and a Yurcor fee taken out of it."  (*Id.* at P 473.)  On its face, this document merely provides a general overview of Yurcor's EOR services.  (*Id.*)  Framestore suggests that this document explained that the $600 Weekday Base Rate was not Plaintiff's wage, but this misrepresents the Step-by-Step guide, which speaks in generic terms not specific dollar amounts. The Step-by-Step Guide states that "the agreed upon Yurcor bill rate to Framestore is NOT your pay rate," but is silent on the amounts to which the Bill Rate and Pay Rate correspond.  (*Id.*) Given its generic wording and lack of detail as to any particular amount to which Plaintiff was to be paid, the Step-by-Step Guide does not constitute an offer of what Yurcor would pay to Plaintiff as his wage.  *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 338, 349–50 (S.D.N.Y. 2013) (considering the content of an email exchange and concluding that "[the] email response did not constitute the offer that was a necessary predicate for contract formation," because "[a] reasonable jury could not read it to propose mutual promises in consideration for each other").

Similarly, the NYLL wage notice purportedly given to Plaintiff cannot be viewed as an offer of a particular wage.  Defendants cite no case, and the Court has uncovered none, supporting their assertion that a wage notice pursuant to section 195 of the NYLL constitutes an offer that could give rise to a binding agreement as to an employee's wage.  This reading of

section 195 is contradicted by the availability of a private right of action to seek damages for receiving an improper wage notice. As courts in this Circuit have held, an employee may bring a claim under section 195 for an employer providing the employee with a wage notice that did not accurately reflect the employee's wages. *See Copper v. Cavalry Staffing, LLC*, --- F. Supp. 3d ---, ---, 2015 WL 5658739, at *5 (E.D.N.Y. Sept. 25, 2015) ("The dramatic expansion of civil penalties and the [Wage Theft Prevention Act] remedial purpose convince the Court that the New York legislature did not intend for inaccurate statements of overtime hours to satisfy the WTPA's wage-notice requirements [under section 195]."); *Salinas v. Starjem Rest. Corp.*, --- F. Supp. 3d ---, ---, 2015 WL 4757618, at *22 (S.D.N.Y. Aug. 12, 2015) ("The wage statements that Fresco provided [the] [p]laintiffs failed to indicate that the tip credit . . . was being taken. . . . Accordingly, [the] [p]laintiffs did not receive wage statements compliant with § 195(3)."); *Carter v. Tuttnaeur U.S.A. Co.*, 78 F. Supp. 3d 564, 570 (E.D.N.Y. 2015) ("[T]here exists a genuine issue of material fact as to whether the [d]efendant properly documented the [p]laintiff's overtime pay [pursuant to NYLL § 195(3)].")). If an employee's receipt and acceptance of a wage notice, even an erroneous one, gave rise to a binding agreement as to the wage listed on that notice, it would be unnecessary to provide the employee a right of action to seek damages for receiving a wage notice that listed the wrong wage. Because section 195 provides such a right of action, the Court cannot find that section 195 supports Defendants' position. While the wage notice and its acknowledgement may serve as evidence of what the parties intended to agree to as Plaintiff's wage, the wage notice did not, by itself, constitute an offer of that wage.

Accordingly, although the Step-by-Step Guide and the NYLL Wage Notice may constitute extrinsic evidence of the parties' intent as to an agreement on Plaintiff's wage, they do not alone, or together, give rise to an enforceable agreement.

## 2. Interpretation of the booking emails

Having found that the June 6, 2012 Booking Email and Plaintiff's response constitute an agreement, the Court next determines whether, as Plaintiff suggests, the terms of this agreement established Plaintiff's wage. The relevant issue is the "rate" to which the parties agreed. According to Plaintiff, the "$600 Weekday Base Rate in the June 6, 2012 Booking Email represented the wage that Framestore would pay Plaintiff for his work. (Pl. Mem. 9–10.) While Framestore does not rigorously assess the significance of the any booking email, Framestore does assert that the "rate" referred to in the June 6, 2012 Booking Email was not Plaintiff's wage, but rather the Bill Rate Framestore would pay to Yurcor for Plaintiff's services under the EOR arrangement. (Framestore 56.1 ¶ 14 ("The bill-rate was the amount communicated to the freelancer at the time of the booking and agreed to as between Framestore, the freelancer, and Yurcor."); Framestore Opp'n 11.) As discussed below, the Court finds that the reference "rate" as used in the Booking Emails is ambiguous, and could support Plaintiff's and Framestore's distinct interpretations.

"[T]he initial interpretation of a contract is a matter of law for the court to decide." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2006)). "When interpreting a contract [under New York law], the 'intention of the parties should control, and the best evidence of intent is the contract itself.'" *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (alteration in original) (citations and internal quotation marks omitted). "At the outset, the court must determine whether the language the parties have chosen is ambiguous." *Id.* at 313 (citing *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015)

(quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)); *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).

Courts "determine ambiguity by 'examin[ing] the entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed," interpreting "[p]articular words . . . not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *JA Apparel Corp.*, 568 F.3d at 405 (alterations in original) (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)). A contract is unambiguous if its "language has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (quoting *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)). A contract is ambiguous where its terms "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usage and terminology as generally understood in the particular trade or business.'" *First Mercury Ins. Co. v. 613 N.Y. Inc.*, 609 F. App'x 664, 666 (2d Cir. 2015) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)).

A term is not ambiguous merely because the parties disagree as to its meaning and "urge different interpretations." *JA Apparel Corp.*, 568 F.3d at 396; *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 598 (2d Cir. 2005). However, "[e]ven where an agreement seems clear on its face, a 'latent ambiguity' may exist by reason of 'the ambiguous or obscure state of extrinsic circumstances to which the words of the instrument refer.'" *Teig v. Suffolk Oral Surgery Assocs.*, 769 N.Y.S.2d 599, 600 (App. Div. 2003). An agreement presents latent

ambiguity where one of its terms may "apply equally to two different things or subject-matters," as shown by extrinsic circumstances or agreements. *See Leather Form S.R.L. v. Knoll, Inc.*, 205 F. App'x 861, 864 n.1 (2d Cir. 2006) (quoting *Petrie v. Trustees of Hamilton College*, 158 N.Y. 458, 464 (N.Y. 1899)); *see In re Estate of Phillips*, 957 N.Y.S.2d 778, 781 (App. Div. 2012) ("A latent ambiguity arises when the words used are neither ambiguous nor obscure but ambiguity appears relative to persons or things meant"); *Hoyt v. Kingsford*, 586 N.Y.S.2d 793, 794 (App. Div. 1992) (finding latent ambiguity in purchase agreement when read together with separate agreement between plaintiff and third-party defendant); *see also* 11 Williston on Contracts § 33:43 (4th ed.) ("[L]atent ambiguities are those which appear only as the result of considering extrinsic or collateral evidence that shows that a word, thought to have only a single meaning, actually has two or more meanings.").

### A.    "Rate" is latently ambiguous

Here, while the June 6, 2012 Booking Email and Plaintiff's response, and the subsequent booking emails and responses, constituted agreements between Plaintiff and Framestore, the Court finds that the term "rate," while clearly referring to an amount to be paid by Framestore, is latently ambiguous in the context of the parties' employment arrangement. This latent ambiguity of the "rate" term arises from a critical extrinsic circumstance at the time of the June 6, 2012 Booking Email: it was unknown at the time of the email whether Plaintiff would work for Framestore as an independent contractor or as a "W-2 employee" of Yurcor. As Plaintiff suggests, the $600 Weekday Base Rate could reasonably be understood to be the wage Framestore would pay Plaintiff for his services. Alternatively, however, given the context of the parties' employment arrangement and the possibility of using Yurcor as an EOR, the $600 Weekday Base Rate could also be understood to be the Bill Rate that Framestore agreed to pay to

Yurcor under such an EOR arrangement.

This latent ambiguity arises from the fact that the employment arrangement for Plaintiff's booking was unsettled at the time of the June 6, 2012 Booking Email. The June 6, 2012 Booking Email instructs Plaintiff to establish the method of payment he would use for his booking. (June 6, 2012 Booking Email at P 3172.) At that time, there were mutually exclusive options for his booking: (1) work for Framestore as an independent contractor, or (2) work for Framestore as a W-2 employee of Yurcor using their EOR services. (Method of Payment Email.) Under the first option, if Plaintiff met Framestore's requirements for their independent contractors, he could work and invoice Framestore directly for his work at the rate referenced in the email. (*Id.*; Fed. R. Civ. Proc. 30(b)(6) deposition of Mary Jenson on behalf of Framestore 33:11–25, annexed to Stoler Decl. as Ex. E.) But if Plaintiff elected to use an EOR, that EOR arrangement involved multiple "rates," including the Bill Rate Framestore paid Yurcor for the freelancer's approved time, and the Pay Rate that Yurcor paid to the freelancer as a W-2 employee. Given these facts, the $600 Weekday Base Rate referenced in the June 6, 2012 Booking Email, although seemingly unambiguous when considered in a vacuum, is latently ambiguous in the given context. Whether the $600 Weekday Base Rate was Plaintiff's wage depended on whether Plaintiff subsequently agreed to work as an independent contractor, to whom the "rate" would be paid directly, or as a W-2 employee of Yurcor, to whom the "rate" would be paid as the Bill Rate under the EOR arrangement.

### B. Extrinsic evidence exists to support both interpretations

Because the Court finds that the term "rate" is ambiguous when viewed with the context of the parties' employment arrangement, the Court must consider extrinsic evidence to attempt to resolve what Plaintiff and Framestore intended "rate" to mean.

"[W]here the contract language creates ambiguity, extrinsic evidence as to the parties'
intent may properly be considered." *JA Apparel Corp.*, 568 F.3d at 397 (citations omitted);
*Leather Form S.R.L.*, 205 F. App'x at 864 n.1 (stating that where there is latent ambiguity,
"evidence is admissible to show which of them was the thing or subject-matter intended"
(quoting *Petrie*, 158 N.Y. at 464)). The evaluation of the extrinsic evidence and determination
of the parties' intent will be a jury question, unless the extrinsic evidence supports only one
reasonable conclusion as to the parties' intent. *See Topps Co. v. Cadbury Stani S.A.I.C.*, 526
F.3d 63, 68 (2d Cir. 2008) ("To the extent the moving party's case hinges on ambiguous contract
language, summary judgment may be granted only if the ambiguities may be resolved through
extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic
evidence that would support a resolution of these ambiguities in favor of the nonmoving party's
case."); *Hoyt v. Andreucci*, 433 F.3d 320, 331 (2d Cir. 2006) ("Where, as here, the meaning of a
particular contractual provision is ambiguous and the intent of the parties cannot be determined
from the contractual language itself, the ambiguity presents a question of fact to be resolved by a
jury." (citing *Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 291
(1973)). Such extrinsic evidence may include the parties' communications, statements and
course of dealing. *See Hoyt*, 433 F.3d at 332 ("In determining the meaning of the language at
issue, the jury may consider extrinsic evidence such as the parties' course of conduct throughout
the life of the contract." (citing *Big Tree Energy Partners v. Bradford*, 640 N.Y.S.2d 270, 273
(App. Div. 1996)); *Gurney's Inn Resort & Spa Ltd. v. Benjamin*, 878 F. Supp. 2d 411, 430
(E.D.N.Y. 2012) ("[I]t is well settled that '[i]ntent can be gleaned from many sources,
including . . . the manner in which the provision has been applied in practice over time.'"
(second and third alterations in original) (quoting *Congregation Yetev Lev D'Satmar, Inc. v.*

*Kahana*, 820 N.Y.S.2d 62 (App. Div. 2006), *aff'd*, 9 N.Y.3d 282 (2007)); *Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 381 (S.D.N.Y. 2006) ("[T]he parties' course of dealing throughout the life of a contract is highly relevant to determining the meaning of the terms of the agreement."); *Novel Commodities S.A. v. QBE Ins. Corp.*, No. 11-CV-6339, 2013 WL 1294618, at *6 (S.D.N.Y. Mar. 30, 2013) (considering "very limited extrinsic evidence" contained in emails related to the agreement).

Here, because there is extrinsic evidence from which a jury could reasonably reach either interpretation of Plaintiff's wage rate suggested by the parties, the Court denies the parties' motion for summary judgment as to Plaintiff's section 193 claim.

At least two pieces of documentary evidence support Plaintiff's position that the "rate" as used in describing the $600 Weekday Base Rate was intended to refer to the rate at which Framestore would pay Plaintiff as a wage. At the time Plaintiff commenced work with Framestore, as directed by the June 6, 2012 Booking Email, Plaintiff communicated with Yurcor to establish the EOR service and referenced the $600 Weekday Base Rate as his wage. (Pl. June 19, 2012 Email.) Plaintiff stated that he had agreed with Reinhard to a "pay rate of $600/weekday . . . [which] would change to $650/weekend day," however, as Plaintiff explained, "[Yurcor's] wage form didn't seem to allow space for [those rates]." (*Id.*) The same understanding is reflected in the annotations Plaintiff made to the Yurcor "General Agreement Letter" before he signed it. (GAL at P 3.) Those annotations add the $600 Weekday Base Rate information into the section setting his compensation, which, as annotated, states "[a]s a Yurcor employee, you will be paid on a consistent agreed basis at an initial base rate of $600/first 10 hours [,] $75/hour after 10 [hours] per day[,] $650/day on weekends + $75/hour after 10 [hours] per day." (*Id.*) These extrinsic facts weigh in favor of Plaintiff's interpretation that "rate"

referred to the wage Plaintiff was to be paid.

Conversely, extrinsic documentary evidence and the parties' course of conduct support Framestore's position that the term "rate" referred to the Bill Rate it paid to Yurcor for Plaintiff's services. Yurcor's communications with Plaintiff prior to Plaintiff's work at Framestore appear to reflect an understanding of the $600 Weekday Base Rate as the Bill Rate. On June 19, 2012, Michelle Murphy of Yurcor informed Framestore that Yurcor "received forms from [Plaintiff]," and asked Framestore to "confirm rates." (Murphy June 19, 2012 Email.) In response, Framestore explained "we've agreed to his rates of $600 p/d weekday, $650 p/d weekend, & $75 p/hr after 10 hours worked in a day. All rates are exclusive of Yurcor's 4%." (*Id.*)

The parties' course of dealing also supports Framestore's interpretation. From Plaintiff's first booking in June of 2012 until his last booking in May of 2013, Framestore, Yurcor and Plaintiff treated the $600 Weekday Base Rate as the Bill Rate Framestore paid Yurcor, rather than a wage paid to Plaintiff. Indeed, at no point was Plaintiff paid the $600 Weekday Base Rate. Instead, it is undisputed that Yurcor paid Plaintiff the lower Pay Rate for each payroll period. (PRD, at P 20–P 33.) Plaintiff does not dispute that he reviewed the PRD for his initial paycheck from Yurcor, knew how his pay was being calculated, and thus knew he was not being paid at the $600 Weekday Base Rate. (Pl. Dep. 151:2–8.) Nevertheless, Plaintiff continued to accept additional bookings at the same "rate." (*Id.* at 150:17–21.)

In addition, it is undisputed that Plaintiff received the Step-by-Step Guide, explaining how his Pay Rate was calculated, and Yurcor's NYLL Wage Notice, listing amounts lower than the $600 Weekday Base Rate as his wage. (Step-by-Step Guide Email at P 472; NYLL Wage Notice.) At no point after receiving the Step-by-Step Guide, Yurcor's NYLL Wage Notice or the first PRD, did Plaintiff raise any concern that he was being paid in a manner inconsistent

with his agreement with Framestore. Together, these facts support Framestore's interpretation of Plaintiff's wage rate.

Ultimately, the jury must consider this extrinsic evidence and determine the parties' intent as to whether the "rate" referred to in the $600 Weekday Base Rate was intended to be Plaintiff's wage or the Bill Rate that Framestore would pay Yurcor. Accordingly, the Court denies Plaintiff's and Framestore's motions for summary judgment as to Plaintiff's section 193 claim.[23]

---

[23] In reaching this conclusion, the Court also rejects Plaintiff's argument that any agreement establishing a Bill Rate and a lower Pay Rate is unenforceable as part of an illegal tax evasion and kickback scheme. Plaintiff asserts that the Bill Rate/Pay Rate arrangement constitutes an unlawful scheme to lower Framestore's production costs by avoiding the payment of employer taxes. (Pl. Opp'n Fr. 3.) According to Plaintiff, the purported scheme had three parts: First, Framestore agreed to employ a freelancer at a particular wage but "disguised" the freelancer as an employee of Yurcor instead of Framestore. (*Id.*) Second, Yurcor "lowered" the wage to which Framestore and the freelancer had agreed and called it the Pay Rate. (*Id.*) Third, Framestore paid Yurcor a Bill Rate sufficient to cover the workers' compensation premiums and employer taxes Yurcor owed on the lower Pay Rate, plus a 4% fee for Yurcor's services. Stated by way of example, according to Plaintiff, Framestore would agree to employ a freelancer at a wage of $110 per day, but then "disguise" the freelancer as an employee of Yurcor. Next, Yurcor agreed to pay the employee $100 per day as a Pay Rate, on which it would owe $10 in employer taxes and workers' compensation premiums. Finally, in order to cover that $10 expense, Framestore agreed to pay Yurcor a Bill Rate of $110 per day for the "disguised" employee's work, plus a 4% fee for Yurcor's services.

This argument fails because although Plaintiff refers to "tax evasion," the record includes no facts suggesting that Defendants evaded or failed to pay employer taxes and workers' compensation premiums that were owed based on the Pay Rate paid to Plaintiff. As reflected in Plaintiff's description of the "scheme," employer taxes and worker's compensation premiums owed on the Pay Rate were built into, and paid from, the Bill Rate. (Pl. Opp'n Fr. 3.) Instead, Plaintiff's argument begs the central question in this case — what did Plaintiff agree to receive as his wage. To the extent Plaintiff agreed with Framestore on a $600 per day and $650 per weekend day wage, an arrangement under which that wage was treated as a Bill Rate and subject to deduction would violate section 193 of the NYLL. However, to the extent Plaintiff merely agreed with Framestore on a $600 per day and $650 per weekend day Bill Rate to be paid to Yurcor, the deductions from that Bill Rate were permissible. As discussed above, the question of what the parties agreed would be Plaintiff's wage must be resolved by a jury.

### c. Section 195 claim against Framestore

Plaintiff moves for summary judgment as to his claim against Framestore for violation of section 195 of the NYLL, arguing that Framestore never provided him with a wage notice and that the wage notice provided by Yurcor was insufficient because (1) it was not issued by Framestore, (2) did not accurately reflect Plaintiff's wage rate, and (3) was not timely provided to him. (Am. Compl. ¶¶ 50–53; Pl. Mem. 22; Pl. Opp'n Fr. 9.) Framestore cross-moves for summary judgment as to Plaintiff's section 195 claim, arguing that because it is undisputed that Plaintiff was sent the Yurcor NYLL Wage Notice, his section 195 claim fails as a matter of law. (Framestore Mem. 12–13; Fr. Mem. in Opp'n to Pl. Mot. ("Fr. Opp'n") 21–23, Docket Entry No. 77.)

"As of April 9, 2011, an employer must provide an employee with a wage notice within ten business days of the start of employment and then annually every February thereafter." *Carter v. Tuttnaeur U.S.A. Co.*, 78 F. Supp. 3d 564, 569 (E.D.N.Y. 2015) (citations and internal quotation marks omitted). Among other things, this notice must include (1) "the rate or rates of pay and basis thereof," (2) "whether paid by the hour, shift, day, week, salary, piece, commission, or other;" (3) "the regular pay day designated by the employer;" (4) "the name of the employer;" (5) "any 'doing business as' names used by the employer;" and (6) "such other information as the commissioner deems material and necessary." N.Y. Lab. Law § 195(1). Under the statute, if a wage notice under section 195 is not provided "within ten business days of" the employee's "first day of employment," the employee "may recover in a civil action damages of fifty dollars for each work week that the violations occurred or continue to occur, but not to exceed a total of two thousand five hundred dollars." *Id.* § 198(l-b); *see also Carter*, 78 F. Supp. 3d at 570 (citing N.Y. Lab. Law § 193(1-b)).

Here, Plaintiff presents three reasons to reject the Yurcor wage notice and impose section 195 liability as a matter of law. The Court first considers Plaintiff's arguments as to timeliness, which are unfounded. It is undisputed that within ten business days of Plaintiff's first booking, Yurcor sent Plaintiff the Yurcor NYLL Wage Notice, reflecting a Pay Rate of $503.19 per day "on the first $8500 gross payroll" and $552.79 per day "after $8500 in gross payroll." (NYLL Wage Notice; Framestore Mem. 12–13.) Plaintiff does not dispute the authenticity of the NYLL Wage Notice, or that it was sent to him, but instead argues that there is a lack of direct evidence that he received or signed the NYLL Wage Notice. (POF 56.1 ¶ 32.) This does not create a disputed issue of fact. *See Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 818 (2d Cir. 1985) (finding "evidence of lack of receipt [to be] insufficient to create an issue of fact" regarding whether the defendant sent the requisite bond notice where some of the purported recipients of the notices stated they "never received notice" and others "did not recall receiving notice"). Accordingly, the Court finds no merit to Plaintiff's timeliness challenge. Thus, Plaintiff's argument that he is entitled to summary judgment as a matter of law turns on two assertions: (1) the wage notice was insufficient as a matter of law because it was not issued by Framestore and (2) even if it was sufficient, the wage notice did not accurately reflect Plaintiff's wage rate. (Pl. Mem. 22; Pl. Opp'n Fr. 9)

In order to resolve these arguments, the Court first addresses a related issue raised by Plaintiff's arguments — whether Yurcor and Framestore jointly-employed Plaintiff.

### i. Framestore and Yurcor were joint-employers under the NYLL

Throughout this litigation, Plaintiff has asserted that Yurcor was not his employer, and was merely a payroll company for Framestore, the entity Plaintiff argues was his true

employer.[24]  (Am. Compl. ¶¶ 3–4; Pl.-Fr. Reply 2 & n.3; Pl. Opp'n Fr. 7 n.20 ("There is only

one employer and that is Framestore.").)  Yurcor, however, has consistently maintained that,

through its EOR service, it acted as Plaintiff's employer for "payroll and benefit needs."  (Yur.

56.1 ¶ 2; Yur. Dep. 36:23–25; 69:12–17.)  In its Answer to the Amended Complaint, Framestore

disclaimed any employer status, asserting that Plaintiff's claims as to Framestore were "barred

because Framestore was not an 'employer' of [Plaintiff], as defined by the New York Labor Law

and implementing regulations."  (Framestore Ans. 10, Docket Entry No. 41.)  However, in

moving for summary judgment, Framestore reverses course, asserting that Framestore and

Yurcor were Plaintiff's joint-employers.  (Framestore Mem. 5 n.1; Framestore Opp'n 1.)

Apparently based on that joint-employer relationship, Framestore asserts that Yurcor's NYLL

Wage Notice was sufficient.  (Framestore Reply 9–10.)  Despite these varied and vacillating

positions, the undisputed facts establish that, as a matter of law, Framestore and Yurcor were

joint-employers.

    In circular fashion, "[t]he NYLL defines 'employer' as 'any person . . . employing any

individual in any occupation, industry, trade, business or service' or 'any individual . . . acting as

employer.'"  *Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013) (second alteration in

original) (quoting N.Y. Lab. Law §§ 190(3), 651(6)), *cert. denied*, 134 S. Ct. 1516 (2014).  The

New York Court of Appeals has yet to state a specific test for an "employer" under the NYLL.

*See Irizarry*, 722 F.3d at 117.  Nevertheless, "[d]istrict courts in this Circuit 'have interpreted the

definition of 'employer' under the [NYLL] coextensively with the definition used by the [Fair

_____

    [24]  On May 14, 2015, the Court dismissed Plaintiff's section 193 and section 195 claims
against Yurcor as legally insufficient after Plaintiff conceded that he was not alleging that Yurcor
was not his employer.  (May 14, 2015 Min. Entry; Compl. ¶¶ 4, 32, 41.)  As Plaintiff conceded at
that time, liability under section 193 and section 195 is premised on an entity being an employer.
(May 14, 2015 Hr'g Tr. 4:6–5:8; Minute Entry dated May 14, 2015.)

Labor Standards Act ('FLSA')].'" *Jin Dong Wang v. LW Rest., Inc.*, 81 F. Supp. 3d 241, 258 (E.D.N.Y. 2015) (quoting *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010)); *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 37 (E.D.N.Y. 2015) (same); *Hart*, 967 F. Supp. 2d at 940.

"The determination of whether an employer-employee relationship exists does not depend on 'isolated factors but rather upon the circumstances of the whole activity.'" *Velez v. Sanchez*, 693 F.3d 308, 326 (2d Cir. 2012) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)); *Irizarry*, 722 F.3d at 104 (A court's analysis of whether an entity qualifies as an employer "should be grounded in 'economic reality rather than technical concepts." (citations and internal quotation marks omitted)). Overall, the assessment of the economic realities will be "fact-intensive," and, oftentimes, will be resolved by a fact-finder. *See Barfield v. NYC Health and Hosps. Corp.*, 537 F.3d 132, 143 (2d Cir. 2008); *Zheng*, 355 F.3d at 76 n.13 (noting that the "fact-intensive character of the joint employment inquiry is highlighted by the fact that two of the three leading cases in this circuit were appeals from judgments following bench trials" (citations omitted)).

The Second Circuit has identified tests helpful to courts assessing the economic realities of a relationship and whether an employer-employee relationship exists. *See Zheng*, 172 F.3d at 72; *Carter*, 735 F.2d at 12. First, assessment of an entity's formal control may demonstrate the economic reality of the employer-status. *See Carter*, 735 F.2d at 12. Factors relevant to that assessment include "(1) the power to hire and fire employees, (2) the ability to supervise and control employee work schedules or terms of employment, (3) authority over the rate and method of employee payment, and (4) the maintenance of employment records." *Brown v. New York City Dep't of Educ.*, 755 F.3d 154, 167 (2d Cir. 2014) (citing *Carter*, 735 F.2d at 12);

*Abimola v. Metro. Transp. Auth.*, 37 Misc. 3d 1221(A), 964 N.Y.S.2d 57 (Sup. Ct. 2012) (describing these factors as those relevant to a question of joint-employment).  Critically, these factors are not exhaustive or exclusive and none are dispositive.  *See Velez*, 693 F.3d at 326 ("None of these factors is dispositive."); *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 350 (E.D.N.Y. 2015) ("No single factor is dispositive; the court's analysis is based on the totality of the circumstances."); *Sai Qin Chen v. E. Mkt. Rest., Inc.*, No. 13-CV-3902, 2015 WL 5730014, at *7 (S.D.N.Y. Sept. 30, 2015) ("These factors are not exclusive, and the plaintiff need not satisfy all of them to demonstrate that a particular defendant is an employer.").

Although the exercise of "formal" control may reveal the economic reality of an employer-employee relationship, a determination that an entity exercised "functional" control may also reveal an employer-employee relationship.  *See Zheng*, 355 F.3d at 72.  In making that assessment, courts consider:

> (1) whether [the alleged employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractor] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to [the alleged employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [alleged employers'] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [alleged employers].

*Id.*; *see Ovadia v. Office of Indus. Bd. of Appeals*, 19 N.Y.3d 138, 145 (2012) (citing *Zheng* six-factor test but noting that the court "need not resort to federal precedent to resolve [the] issue [presented]").  While these tests may inform the economic realities analysis, a court is "also free to consider any other factors it deems relevant to its assessment of the economic realities." *Grenawalt v. AT & T Mobility, LLC*, 937 F. Supp. 2d 438, 449 (S.D.N.Y. 2013) (citing *Zheng*, 355 F.3d at 72).

"The joint employer doctrine has been applied to temporary employment or staffing agencies and their client entities." *Haight v. NYU Langone Med. Ctr., Inc.*, No. 13-CV-4993, 2014 WL 2933190, at *11 (S.D.N.Y. June 27, 2014) (first quoting *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y.2009); and then collecting cases); *see Barfield*, 537 F.3d at 146–48; *Copper*, --- F. Supp. 3d at ---, 2015 WL 5658739, at *1. In *Barfield*, the Second Circuit found that a temporary employee who was assigned by her staffing agency to work at one of the agency's client-hospitals was jointly-employed by both the agency and the hospital. *Barfield*, 537 F.3d at 147. The court assessed the formal and functional control exercised over the temporary employee, explaining that "[b]ecause [the plaintiff] was paid, and in that sense employed, by the nursing referral agencies, the critical liability question was whether [the hospital] was also [the employee's] employer under the terms of the FLSA." *Barfield*, 537 F.3d at 137 (citation and internal quotation marks omitted)). Finding that the hospital and the agency were joint-employers, the court highlighted, among other things, the hospital's supervision and documentation of the employee's work schedule, that the employee was "directly supervised only by [the hospital's] staff," and completed "the same work" that was "routinely performed by [the hospital's] fulltime employees." *Id.* at 147–48; *see also Copper*, --- F. Supp. 3d at ---, 2015 WL 5658739, at *1–2 (denying motion to dismiss where plaintiff had plausibly alleged that staffing agency and its client were joint-employers, as the client "exercised functional control over [the employees]," noting that "all of the work they performed . . . was done exclusively on [the client's] premises," and was directed and supervised by the client's managers).

Here, the working arrangement between Plaintiff, Framestore and Yurcor mirrored that of

a staffing, consulting or temporary employment agency in several respects.[25]  Pursuant to the

Client Agreement, Yurcor was required to provide its client, Framestore, with freelancers

like Plaintiff who performed work for Framestore, but were paid by Yurcor.  (Client

Agreement 1–3.)  Although the arrangement tracks that of staffing and temporary employment

agencies, the Court confronts a problem not normally confronted in that setting — Framestore

(the client) claims joint-employer status with Yurcor (the agency) while Plaintiff (the employee)

attempts to argue that Yurcor is *not* a joint-employer.  Despite the unorthodox legal position of

each party, applying the controlling law of this Circuit to the undisputed facts, the Court

concludes that as a matter of law, Yurcor and Framestore were both Plaintiff's employer.

     The record as to Yurcor's formal control over Plaintiff reveals that, in the economic

reality of the parties' relationship, Yurcor was an employer.  As to Yurcor's "power to hire and

fire" Plaintiff, the undisputed evidence shows that Yurcor had a minimal role in an employee's

hiring, but did retain some discretion to fire him.  As to hiring, it is undisputed that Framestore,

and not Yurcor, recruited, interviewed and engaged Plaintiff for his work on their projects.  (Pl.

56.1 ¶¶ 40, 72; Fr. Opp'n 56.1 ¶¶ 40, 72; Yur. Opp'n 56.1 ¶¶ 40, 72.)  While this control rested

primarily with Framestore, it is also undisputed that, at the time of his hiring, Plaintiff was

required to complete various employment-related forms exclusively for Yurcor, not Framestore,

including, among other things, Yurcor's General Agreement Letter and forms related to his

decision to receive or reject Yurcor employee benefits.  (Pl. June 19, 2012 Email.)  This shared

authority supports Yurcor's status as a joint-employer.  *See Barfield*, 537 F.3d at 144 (noting that

---

[25]  Indeed, Yurcor described its EOR services as akin to that of a staffing or temporary
employment firm.  (Step-by-Step Guide Email at P 472 ("Yurcor's EOR is similar to how
staffing firms engage contract workers."); Client Agreement 1 ("Yurcor . . .  is in the business of
providing, through employees of Yurcor, services to clients who have requested temporary
staffing.").)

the fact that one entity exercised "ultimate authority" over some function while a second entity only exercised "some authority" still "helps establish the economic reality of [the second entity's] status as a joint employer"). Regarding the authority to fire Plaintiff, it is undisputed that, at a minimum, Yurcor could fire Plaintiff "if specific circumstances arose," such as Plaintiff's failure to file paperwork necessary for his employment.[26] (Pl. 56.1 ¶ 80; Fr. Opp'n 56.1 ¶ 80; Yur. Opp'n 56.1¶ 80; Yurcor Resp. to Pl. Interrogatory No. 12, annexed to Libicki Decl. as Ex. 25.)

As to Yurcor's "supervision and control" over Plaintiff's "work schedule or condition of employment," this factor minimally supports Yurcor's status as an employer. It is undisputed that Framestore set Plaintiff's hours and work schedule, including any time off from work. (Pl. 56.1 ¶ 71; Yur. Opp'n 56.1 ¶ 71.) However, there is evidence that Yurcor also supervised Plaintiff's schedule in important respects. Plaintiff was required to submit his time records to Yurcor, through their online program, for all of the hours Plaintiff worked at Framestore. (Yurcor Dep. 119:16–19.) Based on those records, Yurcor sought Framestore's approval of those hours as the hours Plaintiff worked by going through Yurcor's website. (*Id.* at 119:20–25.) After receiving the final "approved time," Yurcor determined Plaintiff's payroll. (*Id.*)

Yurcor's role in Plaintiff's compensation and its maintenance of the employment records strongly support its status as an employer. Although there are disputed issues of fact as to whether there was a specific agreement establishing Plaintiff's wage, it is undisputed that Yurcor exercised exclusive control over Plaintiff's pay. Yurcor paid Plaintiff his wage, established the frequency of Plaintiff's pay, paid employer taxes due on his wages, withheld the employee

---

[26] Framestore maintains that Yurcor had full authority to hire or fire Plaintiff. (Fr. Opp'n 56.1 ¶ 80.) However, Yurcor does not dispute Plaintiff's assertion that it lacked authority to fire Plaintiff. (Yur. Opp'n 56.1 ¶ 80.)

payroll taxes due on Plaintiff's wages, and issued IRS W-2 forms based on that pay. These facts strongly support Yurcor's status as Plaintiff's employer. *See Barfield*, 537 F.3d at 137 ("[The plaintiff] was paid, and in that sense employed, by the nursing referral agencies." (citations and internal quotation marks omitted)); *see also Beltre v. Lititz Healthcare Staffing Sols. LLC*, 757 F. Supp. 2d 373, 378 (S.D.N.Y. 2010) (finding that it "strained credulity" to argue that pleadings as to staffing agency could not, as a matter of law, establish employer-status where agency "admit[ted] that it pays and manages payroll for the technicians it refers to [clients]"). In addition, Yurcor's maintenance of Plaintiff's employment records also supports its status as an employer as it is undisputed Yurcor maintained all of Plaintiff's payroll records, including, as stated above, the records of his hours worked and taxes owed on those hours. (Fr. 56.1 ¶ 38; POF 56.1 ¶ 38.)

Moreover, because these factors are non-exhaustive, the Court also finds the Client Agreement between Framestore and Yurcor and the Yurcor General Agreement Letter signed by Plaintiff to be compelling evidence of the economic reality that Yurcor was Plaintiff's employer. The Client Agreement between Framestore and Yurcor refers to the freelancers as employees of Yurcor who would provide services to Framestore. (Client Agreement 1 ("Yurcor . . . is in the business of providing through employees of Yurcor, services to clients who have requested temporary staffing, to perform computer graphics artist [sic] . . . ."); *id.* at 3 ("Yurcor has advised the 'Yurcor Employee' that the 'Yurcor Employee' is an employee of only Yurcor and not an employee of Client . . . ."). The Yurcor General Agreement Letter signed by Plaintiff purported to "confirm [Yurcor's] offer . . . of employment," and referred to terms applicable to Plaintiff "as a Yurcor employee." (GAL at P 3.) For purposes of accurately assessing the economic reality of the parties' relationship, the Court finds it relevant that, at the inception of the relationship with

Plaintiff and Framestore, Yurcor held itself out as Plaintiff's employer. *See Beltre*, 757 F. Supp. 2d at 378 (finding it relevant that, in addition to managing payroll for the temporary technicians, the defendant "entered into a contract in which it stated explicitly that it was those technicians' *sole employer*"). Thus, contrary to Plaintiff's claim, the Court finds that Yurcor was a joint-employer with Framestore

### ii. Validity of the NYLL Wage Notice

Having found that Yurcor and Framestore were joint-employers of Plaintiff, the Court turns to the remaining legal issues raised on summary judgment: (1) whether the Yurcor NYLL Wage Notice satisfied Framestore's obligations under section 195 and (2) whether the Yurcor NYLL Wage Notice was accurate. Neither of those questions can be resolved at this stage, and the Court therefore denies the parties' motions for summary judgment.

### 1. Sufficiency of the notice

As to the sufficiency of the Yurcor NYLL Wage Notice, having found that Framestore and Yurcor were joint-employers of Plaintiff, a related question arises as to whether section 195(3) requires a wage notice from one or both of the joint-employers. By its terms, NYLL section 195(1) requires an employer to send a wage notice to Plaintiff. N.Y. Lab. Law. § 195(1). But the statute is silent as to whether, in a joint-employer relationship, either employer, or both, must send a wage notice. It appears that neither the New York Court of Appeals nor the lower appellate courts in New York have considered the effect of a joint-employer arrangement on the wage notice requirements of section 195. Nevertheless, as Plaintiff acknowledged at oral argument on the parties' motion, it does not appear that the NYLL imposes a requirement that each joint-employer send a wage notice to an employee they jointly employ. (Jan. 28, 2016 Hr'g Tr. 32:11–17.) "In matters of statutory interpretation, [the court's] primary consideration is to discern and give effect to the Legislature's intention." *Albany Law Sch. v. N.Y. State Office of*

*Mental Retardation & Developmental Disabilities*, 19 N.Y.3d 106, 120 (2012). Normally, "the text of a statutory provision 'is the clearest indicator of legislative intent and courts should construe unambiguous language to give effect to its plain meaning.'" *Id.* (quoting *DaimlerChrysler Corp. v. Spitzer*, 7 N.Y.3d 653, 660 (2006)). In addition, courts "should inquire 'into the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history.'" *Id.* (quoting *Nostrom v. A.W. Chesterton Co.*, 15 N.Y.3d 502, 507 (2010)).

Although the text of the NYLL is silent as to this issue, the legislative history is instructive. The current notice requirements of section 195 were enacted as part of the New York Wage Theft Prevention Act ("WTPA"), which came into effect on April 9, 2011. Labor Law Wage Theft Prevention Act, 2010 Sess. Law News of N.Y. Ch. 564 (S. 8380). In enacting the WTPA, New York State sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately." N.Y. Sponsors Mem., 2010 S.B. 8380 (Oct. 28, 2010) 233rd Legislature, 2010 Regular Session; *see also Copper*, --- F. Supp. 3d at ---, 2015 WL 5658739, at *4 (discussing the legislative history of the WTPA and its changes to section 195).

As to the "notice and record keeping" requirements of section 195(3), the WTPA amended section 195(3) to require specific types of information employers must disclose in the wage rate notice, including allowances and the "basis of wage payment" such as hourly, shift, or daily. *Id.* The WTPA also added requirements under section 195(3) to facilitate an employee's comprehension of the information, requiring the Department of Labor to create "dual-language template notices," and requiring an employee to affirm that he or she accurately told the employer in his or her primary language. *Id.* The position of the WTPA's legislative sponsors

elucidates the purpose of section 195's new requirements, explaining that the act's requirements were a response to "large number[s] of employees . . . earning less than minimum wage [or] being paid less than their correct wage." *Id.* They noted that "many employers are failing to adequately inform their employees of their wages and how they are calculated in a language they can comprehend." *Id.* Looking at the statute's language and legislative history, it is not apparent that section 195 of the NYLL was intended to require multiple joint-employers to issue duplicative wage notices to an employee they jointly-employ. The WTPA's purpose seems to be satisfied even where only one of many joint-employers provides an employee with a wage notice containing the information specified by section 195.

Because it is undisputed that Plaintiff received the NYLL Wage Notice from Yurcor, the Court turns to the relevant issue as to Plaintiff's section 195 claim — whether the NYLL Wage Notice sent by Yurcor was accurate.

### 2. The accuracy of the wage notice

The accuracy of the Yurcor NYLL Wage Notice turns on the disputed issue of fact as to what constituted Plaintiff's wage. Because this issue must be decided by a jury, the Court denies the parties' motions for summary judgment as to Plaintiff's section 195 claim.

### d. Conversion claim against Framestore and Yurcor

Plaintiff asserts a claim for conversion of wages against both Defendants. (Am. Compl. ¶¶ 54–59.) Both Framestore and Yurcor seek summary judgment as to Plaintiff's conversion claim, arguing that Plaintiff's claim fails as a matter of law, because there can be no conversion based on a "mere obligation to pay money." (Framestore Mem. 13–14; Yurcor Mem. 9–10.) According to Defendants, because Plaintiff's wage was the Pay Rate, he had no legal entitlement to the Bill Rate, and any deductions from that rate cannot support this conversion claim.

"[C]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995)). "Under New York law, a plaintiff stating a claim for conversion must show that he 'had legal title or an immediate superior right of possession to [an] identifiable fund and the exercise by defendants of unauthorized dominion over the money in question to the exclusion of plaintiff's rights.'" *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 341 (S.D.N.Y. 2005) (alteration in original) (quoting *Bakers Trust Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro*, 590 N.Y.S. 2d 201, 201 (App. Div. 1992); *Fin. Technologies Int'l, Inc. v. Smith*, 247 F. Supp. 2d 397, 413 (S.D.N.Y. 2002) ("[C]onversion claims may be based on money only if the plaintiff has a right to immediate possession of a specific, identifiable amount.").

The improper withholding of an employee's wages can support a conversion claim. *See Bazignan v. Team Castle Hill Corp.*, No. 13-CV-8382, 2015 WL 1000034, at *4 (S.D.N.Y. Mar. 5, 2015) ("The Court agrees that Plaintiff is entitled to actual damages for conversion. Plaintiff credibly testified that while his wage statements reflected deductions for tax purposes, he never received documentation that the money had been remitted to the government."); *Arena v. Plandome Taxi Inc.*, No. 12-CV-1078, 2014 WL 1427907, at *18 (E.D.N.Y. Apr. 14, 2014) ("[T]here are issues of fact as to whether Defendants converted Plaintiffs' monies by deducting monies from their wages for car insurance premiums and taxes without permission or authority to do so."); *Doo Nam Yang*, 427 F. Supp. 2d at 341 ("[B]ecause defendants exercised unauthorized dominion over this money by withholding this portion of his wages, plaintiff is entitled to $348 in damages.").

Here, Plaintiff's claim does not fail as a matter of law, but turns on the disputed issue of

fact as to what constituted Plaintiff's wage. Defendants' arguments ignore that Plaintiff's conversion claim rests on a specifically identifiable source of funds — the funds paid to Yurcor based on the $600 Weekday Base Rate, from which Yurcor deducted the Yurcor Administrative Overhead. As noted by Framestore, a conversion claim is not insufficient as a matter of law if "the money converted was in specific tangible funds of which [Plaintiff] was the owner and entitled to immediate possession." *Ehrlich v. Howe*, 848 F. Supp. 482, 492 (S.D.N.Y. 1994). The relevant legal issue is whether Plaintiff can be considered an "owner" of those funds or "entitled to their immediate possession."

Ultimately, Plaintiff's conversion claim, like his other claims, turns on what constituted Plaintiff's wage. To the extent the $600 Weekday Base Rate was Plaintiff's wage, Plaintiff had an immediate right to their possession supporting a conversion claim. *See Doo Nam Yang*, 427 F. Supp. 2d at 341 ("Yang had an immediate superior right of possession to this fund because the deductions were made from his wages" (internal citations and quotation marks omitted)). To the extent Plaintiff's wage was the Pay Rate, and the $600 Weekday Base Rate was merely a Bill Rate to be paid to Yurcor under the EOR arrangement, his conversion claim fails, because he would have had no possession or control over that Bill Rate. *See Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 204 (2d Cir. 2013) (affirming dismissal of conversion claim "because [the] [p]laintiffs never had ownership, possession, or control of the wages in question prior to the alleged conversion").

Accordingly, the Court denies the parties' motions for summary judgment as to Plaintiff's conversion claim.

### III. Conclusion

For the forgoing reasons, the Court denies the parties' motions for summary judgment.

SO ORDERED:

_____ s/ MKB _____
MARGO K. BRODIE
United States District Judge

Dated: April 8, 2016
Brooklyn, New York